UNITED STATES of America

v.

CFW CONSTRUCTION COMPANY, INC.

Crim. No. 83–300.

United States District Court, D. South Carolina, Florence Division.

March 1, 1984.

Carl W. Mullis, III, Katherine Schlech, Bargery G. Williams, Dept. of Justice, Antitrust Div., Atlanta, Ga., for plaintiff.

Thomas P. Simpson, Columbia, S.C., John Wagster, Nashville, Tenn., for defendant.

## ORDER

HAMILTON, District Judge.

The defendant, CFW Construction Company, Inc. (hereinafter "CFW"), has been indicted for two counts of conspiring to artificially establish bidding prices (i.e., "rig" bids) on two utility construction projects in South Carolina, in violation of the Sherman Act, 15 U.S.C. § 1 (1976).

One such violation allegedly occurred during the period March to October, 1978, and the second violation allegedly took place during the period December 1978 to March 1979. The matter is now before the court upon CFW's motion to dismiss the indictment, which is based upon the following contentions: (a) the Government is precluded from pursuing this matter pursuant to numerous plea agreements it consented to in 1980; in particular the plea agreements of Tennessee Paving Company, Inc., and William R. Carter, chief executive officer of CFW, both entered on June 24, 1980, in the United States District Court for the Middle District of Tennessee; (b) the indictment is the product of prosecutorial vindictiveness and misconduct; and (c) the Government is violating its own internal guidelines relating to prosecution of criminal defendants, and thus is violating CFW's Fifth Amendment rights to equal protection.

### FACTS

CFW, with its principal place of business in Fayetteville, Tennessee, is a company primarily engaged in utility construction. In 1980, CFW was the parent company for a number of subsidiary corporations also operating in the construction industry. Two such subsidiaries, Brown Brothers, Inc. (hereinafter "Brown Bros.") and Tennessee Paving Company, Inc. (hereinafter "Tennessee Paving"), were engaged in road construction work. In addition, Tennessee Paving had acquired an operating subsidiary corporation, Hot-Mix, Inc. (hereinafter "Hot-Mix") by purchase in December, 1976.

In 1979, the United States Department of Justice began an investigation of highway bid-rigging practices in Tennessee. As a result of this investigation, criminal antitrust charges were brought in the Middle District of Tennessee against Brown Bros. and Tennessee Paving. Criminal antitrust charges were also brought against the following individuals for their personal participation in antitrust violations:

(1) *William R. Carter*—chairman of the board and chief executive officer of CFW;

(2) *Bobby R. Rose*—president of Brown Bros., and

(3) *Bradford Miller*—president of Tennessee Paving.

The Government did not seek an indictment in bringing these charges, but did so by way of information. As discussed later, CFW was not named as a defendant in any information.

Pursuant to these informations, plea negotiations began for each defendant. The Government attorney, Richard J. Braun, was contacted in the latter part of 1979 by the defendants' attorney, Edward C. Blank, II. Mr. Blank indicated that he represented not only the named defendants, but also all of the affiliated corporations, including CFW and Hot-Mix. Mr. Blank indicated that CFW and its affiliated corporations and officers were willing to cooperate with the Government and expressed a desire to wrap-up all antitrust violations of the affiliated corporations. (Although CFW had not been charged, it was the target of an investigation into Tennessee bid-rigging practices.)

Plea agreements were eventually worked out for all named defendants. In regard to Bobby Rose and Bradford Miller, the Government agreed that imprisonment for a period of four months was an appropriate sentence. In regard to William R. Carter, the Government agreed that imprisonment for a period of five months was an appropriate sentence. If the court elected to impose a harsher sentence on each individual, each was to be allowed to withdraw his guilty plea. As initially proposed, in return for the pleas of guilty, the Government was to grant these individuals immunity from further prosecution for antitrust violations for "any other construction projects let by awarding authorities within the State of Tennessee" prior to the date of the plea. (Defendant's Exhibit No. 2).

The plea negotiations entered into by the corporate defendants (Tennessee Paving and Brown Bros.) were more troublesome

than for the individual defendants. The corporate defendants requested that, in return for pleading guilty, all affiliated corporations be granted immunity from prosecution for *any* antitrust violations occurring prior to the date of the plea. The Government rejected this proposal, but offered instead to grant immunity to CFW, Tennessee Paving, Brown Bros., and Hot-Mix for any contracts let by awarding authorities *in the State of Tennessee* prior to the plea agreement.

On May 12, 1980, Edward Blank wrote a letter to Richard Braun advising him that there were some problems with the proposed plea on behalf of the corporate defendants:

> In the case of the corporate clients, the only matter that is outstanding is the matter of the effect of the plea agreement on contracts bid prior to the date of May 15th. My original discussions, at least from my thoughts were that we were undertaking the same sort of agreement as Interstate, and the Government, therefore, would be precluded from prosecution on any contracts awarded prior to the date of the settlement. This was of particular importance to me due to the fact that Hot-Mix had operations in Texas, Mississippi, Alabama and Kentucky as well as Tennessee, and that we have not owned Hot-Mix for the full five years of the statute of limitations.
>
> It is my understanding that you have had conferences, as I have had, with Washington, and they have denied the extension of this language to all contracts, and yet you have assured me that there have been various discussions. Frankly those discussions concern me since your statement was that the Department did not want to grant complete immunity in this regard since there were many things left open and unknown to them. As you well know there could be far greater matters left open that we have no knowledge of since we did not purchase the Company until October of 1976, and some contracts signed around the period that we took over could have

been involved prior to the time we actually gained control of the Company. Therefore, the Government is asking us to undertake a responsibility which they themselves are not willing to accept. In this regard in all of our discussions I have advised you that my clients' entire purpose was to try to bring this matter to a conclusion at one time. This, of course, leaves a matter open.

> As a result thereof I have attached an Appendix "B" to this agreement which sets forth the understandings I believe you stated to me as to why you do not feel that Hot-Mix or Tennessee Paving or CFW ultimately would be involved in litigation in states outside of Tennessee....

Letter from Edward C. Blank to Richard J. Braun (May 12, 1980). In attached "Exhibit 'B'," Mr. Black wrote:

### MEMORANDUM OF UNDERSTAND

### AS TO CORPORATE DEFENDANTS,

### CFW CONSTRUCTION CO., INC.

### BROWN BROS., INC.,

### TENNESSEE PAVING, INC.

### AND HOT–MIX, INC.

> 1. The defendants have requested the Government to extend the effect of immunity from contracts to all contracts let prior to the date of the plea agreement, but same has been limited to the State of Tennessee.

*Id.* Exhibit B also went on to state that the Government knew that Hot-Mix was acquired in 1976 and that it had operated in states other than Tennessee prior to Tennessee Paving's acquisition of control over its operations. The Government further acknowledged that there was no indication of an intention to prosecute Hot-Mix in any of these states (which did not include South Carolina) and

> that the general equities adopted by the Antitrust Department of the Department of Justice has been to establish procedures that once a company has pled

guilty and been punished, and did not have control over its operation during a given period as in the case of Hot-Mix, Inc. prior to October, 1976, it does not prosecute further.

*Id.* (Defendant's Exhibit No. 1).

On May 15, 1980, the individual and corporate defendants pled guilty to one count of violating 15 U.S.C. § 1. In taking these guilty pleas, the Chief Judge for the Middle District of Tennessee (hereinafter "District Court"), the Honorable L. Clure Morton, reserved judgment on whether to accept or reject the plea agreements until he had a chance to review the presentence reports. On June 19, 1980, Chief Judge Morton filed an order rejecting the plea agreements previously tendered and entering a plea of not guilty on behalf of the defendants.

After the plea agreements were rejected, William Carter took the position that he could no longer be prosecuted for the antitrust violations. Mr. Carter asserted that the waiver of indictment he signed in the May 15, 1980, proceedings before the District Court could be withdrawn, as it was based upon the acceptance of the guilty plea. Mr. Carter argued that, since his last involvement in the charged antitrust conspiracy took place on May 15, 1975, the five-year statute of limitations had run and he could not be prosecuted for this offense. Mr. Braun took the position that the waiver of indictment remained valid, as it was wholly independent of the plea agreement. (Defendant's Exhibit No. 5).

During the ensuing period, plea negotiations continued between the defendants and the Government. The defendants again requested immunity for all contracts in any jurisdiction let prior to the date of the plea. Mr. Braun indicated that he could grant such immunity to the individual defendants as none of them had conducted operations outside of Tennessee. Mr. Braun once again refused to grant such immunity to the corporate defendants, as each conducted unknown activities outside the State of Tennessee. (Affidavit of Richard J. Braun, Government's Exhibit No. 1). The parties also agreed to extend the period of incarceration for each individual to one year and one day.

On June 24, 1980, a new set of plea agreements was presented to the District Court. While the plea agreements for the individuals contained the above mentioned modifications with respect to periods of incarceration and scope of immunity granted, the corporate plea agreements were identical to the agreements previously presented to the court on May 15, 1980. The District Court accepted the plea agreements on behalf of the individuals. The District Court further entered an order vacating the June 19 order in which it had rejected the earlier pleas of the corporate defendants, and accepted the guilty pleas entered on their behalf on May 15, 1980. Pursuant to the final plea agreements, each defendant was to cooperate with the Government in further investigations of antitrust violations. In return, the individual defendants were granted immunity for any contracts let prior to June 24, 1980. The corporate plea agreements, however, specifically limited the immunity of the affiliated corporate entities to contracts let by awarding authorities in the State of Tennessee. (Defendant's Exhibit No. 6).

Sometime after the completion of the plea agreements, the Antitrust Division of the United States Department of Justice began investigations into bid-rigging practices within the State of South Carolina. As a result of this inquiry, CFW became the target of an investigation for bid-rigging within the state. The Government attorney, Carl W. Mullis, had subpoenas issued directing CFW to produce certain documents. Edward Blank contacted Mr. Mullis and informed him that CFW was under an obligation to cooperate with the Government pursuant to the Tennessee plea agreements, but he contended that CFW, pursuant to those agreements, was immune from any further Government prosecution. When Mr. Mullis responded that the Tennessee agreements afforded no such immunity, CFW refused to produce the requested documents. When Mr. Mullis threatened to obtain a contempt citation,

the subpoenaed documents were produced. CFW continued to take the position that the documents were produced pursuant to the Tennessee plea agreements, while the Government asserted that the production of documents was pursuant to the previously issued subpoena.

In the period leading up to the indictments in this case, Mr. Mullis engaged in plea negotiations with the defendant. Mr. Mullis attempted to induce CFW to plead guilty to one count of bid-rigging in South Carolina, but CFW refused to do so. Subsequently, the Government brought this indictment charging CFW with two counts of bid-rigging in violation of the Sherman Act, 15 U.S.C. § 1.

## LEGAL CONCLUSIONS

### (A) VIOLATION OF THE TENNESSEE PLEA AGREEMENTS

CFW contends that the Government is precluded from bringing this action because it "promised" in the Tennessee plea negotiations that neither CFW, Tennessee Paving, nor Hot-Mix would be indicted in any jurisdiction on account of any contracts let before May 15, 1980. Since the acts for which the defendant is now being prosecuted arose prior to this date, CFW asserts that this court must require specific performance of the plea agreement and dismiss this action.

■ When the Government has entered into a plea agreement, it is well established that federal courts must enforce the agreement and not allow the Government to retract its promises. Where a defendant has relied on the Government's representations and has upheld his obligations under such an agreement, the Government will also be required to honor its promises. *Santobello v. New York*, 404 U.S. 257, 92 S.Ct. 495, 30 L.Ed.2d 427 (1971); *Cooper v. United States*, 594 F.2d 12 (4th Cir.1979).

■ In construing the validity and scope of plea agreements, the court must make analogies to the law of contracts. As was stated by the Fourth Circuit in *Cooper v. United States*, 594 F.2d 12 (1979):

> Both before and since *Santobello*, the courts have understandably drawn heavily on the ready analogies of substantive and remedial contract law to supply the body of doctrine necessary to order plea bargaining practices and to afford relief to defendants aggrieved in the negotiating process. To the extent therefore that there has evolved any general body of "plea bargain law," it is heavily freighted with these contract law analogies. When *Santobello* made it plain, however, that the core concept here is the existence of a constitutional right in the defendant to be treated with "fairness" throughout the process, this presaged inevitably the question of the extent to which contract law may be drawn upon to define the limits of this constitutional right.

*Id.* at 15–16.

In arguments to the court, the defendant repeatedly makes reference to the plea agreements that CFW, its subsidiaries and officers entered into. The court, however, finds *no evidence* whatsoever that CFW was ever indicted or *ever* entered into a plea agreement with the Government. CFW was never named in any indictment until the present one. Although the Justice Department had targeted CFW for investigations into bid-rigging in Tennessee, no charges were ever brought against CFW there, and CFW never entered into a plea agreement with the Government in Tennessee.

The fact that CFW never entered into a plea agreement, however, is not dispositive of the issues presented herein. CFW was clearly a third party beneficiary of the Tennessee Paving plea agreement,[1] and CFW

---

1. The Tennessee Paving plea agreement provided, *inter alia:*

 5. The government agrees that it will not further prosecute defendant, its subsidiary Hot Mix, Inc., *or its parent CFW Construction*

*Company, Inc.* for or on account of any collusion between any of such companies and other contractors regarding any other construction projects let by awarding authorities with-

also alleges that it was a third party beneficiary of the plea agreement entered into by William Carter. Under traditional contract principles, an intended third party beneficiary of a contract may enforce its provisions as against the promisor. 17 Am.Jur.2d *Contracts* § 319 (1964); Restatement (Second) of Contracts § 307 (1981). Thus, if the Government, in negotiating the aforementioned plea agreements, "promised" that there would be no prosecution against CFW for antitrust violations arising in *any* jurisdiction, the promise must be enforced.

The Tennessee Paving plea agreement appears to be dispositive of the scope of immunity granted CFW therein. The plea agreement purports to grant immunity to CFW only for construction projects "let by awarding authorities within the State of Tennessee prior to the date [May 15, 1980] of this agreement." (Defendant's Exhibit No. 2). No mention whatsoever is made of any immunity to be granted for antitrust violations arising in any other jurisdiction. The final paragraph of the plea agreement further stated that "[t]he government has made no other promises to or agreements with the defendant." Furthermore, in entering the guilty plea on behalf of Tennessee Paving, William Carter stated in open court that the written plea agreement set forth the entire understanding between the parties. (Government's Exhibit No. 2, at 6–7).

 Under common law contract principles, the written agreement between the parties would control the scope of immunity granted, notwithstanding any prior agreements to the contrary. Plain and unambiguous written terms may not be contradicted by parol evidence. 17 Am.Jur.2d *Contracts* § 261 (1964). The Fourth Circuit made clear, however, in *Cooper v. United States*, 594 F.2d 12 (1979), that a court is not to be bound by intricate rules of contract law in construing plea agreements. The right to have the Government's obligations under a plea bargain enforced is of constitutional dimensions.

The constitutional right to fairness in the negotiating process may mandate enforcement of a bargain even though the classic elements of contract law have not been satisfied.

This is primarily because contract law is not concerned solely with fairness. True, it contains many elements having a moral or ethical cast designed to ensure minimally fair dealing in the market place, and these elements are readily transposed to the plea bargain context to provide the basis for holding government to its undertakings. But contract law also contains many elements of an essentially neutral moral and ethical cast. Some of these reflect merely a pragmatic necessity to force certainty of consequences in complicated negotiation exchanges. Others reflect an ultimately economic and utilitarian conception of bargaining objects. Among the former are such mechanical rules as those dictating the consequences of particular sequences in the transmission and receipt of contract offers, acceptances, withdrawals, etc. Among the latter is the demand of promissory estoppel for tangible as opposed to merely subjectively felt detriment as the reliance factor. These are all well and good for contract law, but constitutional decisions cannot be made to turn in favor of the government on the fortuities of communications or on a refusal to accord any substantive value to reasonably induced expectations that government will honor its firmly advanced proposals.

*Id.* at 17. The court thus concludes that if the Government in fact agreed that CFW would not be prosecuted for any antitrust violations arising prior to May 15, 1980, the Government should be held to its bargain notwithstanding the fact that such undertaking was not embodied in the written plea agreements.

The evidence presented to the court, however, establishes that no such agreement was reached. In the Tennessee nego-

---

in the State of Tennessee prior to the date of this agreement.

Defendant's Exhibit No. 2. (emphasis added).

tiations, the individual and corporate defendants originally asked to be given immunity for *all* contracts let prior to the dates of the plea agreements. The Government eventually accepted this proposal with regard to the individual defendants, as none had personally engaged in business activities outside of Tennessee. With regard to the corporate defendants, however, the Government clearly and unequivocally rejected this demand. The Government was willing to grant immunity to Tennessee Paving, Hot-Mix, and CFW *only* for contracts let by awarding authorities within Tennessee. This was clearly understood by Edward Blank. On May 12, 1980, Mr. Blank wrote to Richard Braun and set forth what he understood to be the terms of the plea agreements. In the very first paragraph of this document, which was titled "Exhibit 'B', Memorandum of Understand as to Corporate Defendants, CFW Construction Co., Inc., Brown Bros., Inc., Tennessee Paving, Inc., and Hot-Mix, Inc.," Mr. Blank wrote: "1. The defendants have requested the Government to extend the effect of immunity from contracts to all contracts let prior to the date of the plea agreement, *but same has been limited to the State of Tennessee.*" (Defendant's Exhibit No. 1) (emphasis added). The defendant cannot contest that it was unaware of the Government's refusal to grant blanket immunity.

The defendant asserts that the May 12, 1980, cover letter of Mr. Blank (to which the above mentioned "Exhibit 'B'" was attached) creates an ambiguity which must be construed against the Government. Specifically, the defendant contends that the following sentence indicates that the immunity granted was more comprehensive than actually set forth in the plea agreement: "I have attached an Appendix 'B' to this agreement which sets forth the understandings I believe you stated to me as to why you do not feel that Hot-Mix or Tennessee Paving or CFW ultimately would be involved in litigation in states outside of Tennessee." (Defendant's Exhibit No. 1).

As mentioned earlier, the court must construe plea agreements with regard to contract principles. In construing the scope of the immunity granted, the court deems it appropriate to refer specifically to contracts of release. Like a release, the Government's promise of immunity has the effect of absolving a defendant from liability for his wrongful acts.

■ The law is well settled that in construing the scope of a release, a court should not focus solely on specific terms but should consider the entire instrument as well as the facts and circumstances surrounding its execution. 66 Am.Jur.2d *Release* § 30 (1973). To focus solely on the language quoted by the defendant would give an inaccurate indication of the actual intent of the parties. When viewing defendant's Exhibit No. 1 as a whole, it is clear that the quoted language dealt solely with CFW's or Tennessee Paving's liability for the actions of Hot-Mix prior to its 1976 acquisition. In the paragraphs preceding the quoted language, Mr. Blank stated that immunity from all contracts "was of particular importance to me due to the fact that Hot-Mix had operations in Texas, Mississippi, Alabama, and Kentucky as well as Tennessee, and that we had not owned Hot-Mix for the full five years of the statute of limitations." (Defendant's Exhibit No. 1). Mr. Blank also wrote that the Government's refusal to grant blanket immunity to the corporate defendants concerned him because "there could be far greater matters left open that we have no knowledge of since we did not purchase the Company until October of 1976, and some contracts signed around the period that we took over could have been involved prior to the time we actually gained control of the Company." *Id.* In the attached "Exhibit 'B'", Mr. Blank wrote that it was his understanding that (a) the Government was aware that Hot-Mix was not purchased until 1976; (b) that Hot-Mix operated in Alabama, Mississippi, Texas, Kentucky, and Tennessee prior to its acquisition; (c) that Richard Braun had been in contact with the Antitrust Division of the Department of Justice in Atlanta, and that no actions are intended against Hot-Mix in that section of

the country; (d) that no investigations into Hot-Mix were under way in Kentucky; and (e) that Richard Braun had stated that the general equities of the Department of Justice were that once a company had pled guilty and been punished, and did not have control over a subsidiary's operations "as in the case of Hot-Mix, Inc., prior to October, 1976, it does not prosecute further." *Id.* In construing these documents as a whole, it is abundantly clear that Mr. Blank was concerned solely with the derivative liability of the affiliated corporations for the operations of Hot-Mix prior to its acquisition. These documents can in no way be construed as a grant of blanket immunity to all affiliated corporations for their own antitrust violations. To find otherwise would completely negate the Government's explicit refusal to grant blanket immunity to all of the affiliated corporate entities.

CFW contends that, even though the Justice Department refused to grant blanket immunity to the corporations, Mr. Braun informed the defendants that it was the policy of the Government not to further prosecute corporations that had previously been subject to punishment for antitrust violations. Mr. Braun denies this assertion, but recalls telling Mr. Blank that the field prosecutors of the Justice Department had substantial discretion in deciding whether to prosecute a particular defendant. As an example, Mr. Braun cited the case of Ford Construction Company, a construction company which was convicted of antitrust violations in Louisiana. Ford Construction Company thereafter cooperated in antitrust investigations in Tennessee and was not further prosecuted for antitrust violations in that state. Mr. Braun adamantly maintains, however, that this was cited as an example of prosecutorial discretion, not outright Governmental policy. In fact, Mr. Braun knew of at least one case where a corporation was subject to multiple prosecutions for antitrust violations, and he believes he cited this case to Mr. Blank. (Government's Exhibit No. 1, at 5). Finally, Mr. Braun asserts that he referred to prosecutorial discretion in regards to CFW's liability for the operations

of Hot-Mix prior to its acquisition, and the statement related only to the likelihood of Hot-Mix's further liability. In light of this evidence, the court finds no promise that CFW would not be subject to prosecution for its own antitrust violations.

CFW asserts that the plea agreement of William Carter indicates the existence of an agreement not to prosecute CFW. After Chief Judge Morton rejected the original plea agreements, Mr. Carter asserted that his waiver of indictment was defective because it was conditioned upon the acceptance of the plea agreement. Since Mr. Carter's alleged last act in furtherance of the Tennessee antitrust conspiracy was the entry of a complementary bid on May 15, 1975, he asserted that he was protected from prosecution because an indictment was not obtained within the five year statute of limitations. The defendant now asserts that Mr. Carter's agreement to plead guilty to a stale charge indicates the existence of a side arrangement not to prosecute CFW.

■ CFW's argument must fail. Initially, it is clear that a waiver of indictment is not dependent upon the acceptance of a plea bargain. The waiver of indictment is a wholly separate procedure from the entry of a plea agreement, and Richard Braun indicated to Mr. Blank that this was the Government's position on this matter. A waiver of indictment is done by way of Rule 7(b), Federal Rules of Criminal Procedure, whereas a guilty plea is entered pursuant to Rule 11, Federal Rules of Criminal procedure. After being informed of the nature of the charges against him and the right to be indicted by the grand jury, Mr. Carter waived indictment in open court. In so doing, he signed a statement acknowledging that he waived prosecution by indictment and allowed a proceeding by way of information. (Government's Exhibit No. 4, at 3). No indication was made that the waiver was conditioned upon acceptance of the guilty plea. Furthermore, the waiver signed by Mr. Carter was a wholly separate document from any document admitting guilt. Finally, when Mr. Carter even-

tually entered a final guilty plea on June 24, 1980, the District Court did not again inquire whether Mr. Carter waived prosecution by indictment. This is clearly evidence that the waiver of indictment was not dependent upon the acceptance of the first guilty plea.

Mr. Carter's argument concerning the conditional nature of a waiver of indictment was considered and rejected in *United States v. Scavo*, 593 F.2d 837 (8th Cir. 1979). There, the court held:

Appellant claims that the trial court erred in overruling his motion to dismiss the information made just prior to the selection of the jury. The crux of appellant's argument is that his waiver of indictment filed in the ... district court was not knowingly made because he was unaware that his waiver of indictment was effective even though the plea agreement between himself and the United States was not accepted by the district court. In other words, appellant appears to contend that his waiver of indictment was part and parcel of the rejected plea agreement and that the failure of the plea agreement voided his waiver of indictment.

We reject appellant's contention ....

... The record is entirely barren of any suggestion that the waiver of indictment was conditioned upon the acceptance of the plea agreement by the district court. The waiver, signed by appellant and his former counsel in open court, is unequivocal on its face. The memorandum of the plea agreement submitted to the ... district court by the [prosecution] does not indicate that the waiver was a part of the plea agreement....

Finally, we note that the mere fact that a district court allows a guilty plea ... to be withdrawn does not compel the withdrawal of a waiver of indictment entered in conjunction with that plea ....

*Id.* at 843. *See also, United States v. Hammerman*, 528 F.2d 326 (4th Cir.1975).

██ Even if Mr. Carter's position were correct, however, it is clear that the statute of limitations would not have run on the antitrust charges. A conspiracy may continue after the commission of the substantive, underlying offense where one overt act in furtherance of the conspiracy occurred within the limitation period. Where a conspiratorial agreement includes a payoff to each conspirator, the conspiracy continues until the conspirators receive their payoffs. *United States v. Mennuti*, 679 F.2d 1032, 1035 (2d Cir.1982). The evidence is undisputed that Mr. Carter received a check of $92,820.98 in November of 1975 as payment for his submission of a complementary bid. The conspiracy, therefore, continued until that time and the antitrust charges would not have been barred by the statute of limitations. The fact that Mr. Carter pled guilty to the antitrust charges is therefore not probative of a collateral non-prosecution agreement with the Government.

██ Mr. Carter's signed plea agreement provided that "the government agrees that it will not further prosecute defendant for or on account of any collusion between defendant and other contractors regarding any other construction projects let prior to the date of this agreement." (Defendant's Exhibit No. 6). No mention of CFW or any other affiliated corporation is made in the William Carter plea agreement. The plea agreement itself states that the Government had made no other promises to or agreements with the defendant, and Mr. Carter testified in court that the written plea agreement contained the entire agreement between the parties. (Government's Exhibit No. 5, at 6–7). Based upon this evidence, the court concludes that there was no such collateral agreement.

CFW points to the fact that, when signing his plea agreement, the typed language under Mr. Carter's signature read "WILLIAM R. CARTER, CFW Construction Company, Inc." The court deems this a tenuous argument at best. CFW is not mentioned at all in the body of Mr. Carter's plea agreement. Furthermore, it appears that, when he entered his plea, Bobby Rose

signed his name to an agreement containing similar language, i.e., "BOBBY R. ROSE, Brown Brothers, Inc." It is not contended that Mr. Rose's plea agreement purported to include Brown Bros.; in fact, Brown Bros. entered into a wholly separate plea agreement. The court must conclude, therefore, that the typed language below Mr. Carter's signature is surplusage and is not probative of the scope of immunity afforded.

CFW asserts that its cooperation with the Government in the conduct of the South Carolina investigations indicates that it was bound by the Tennessee plea agreements and was cooperating pursuant to them. The evidence indicates, however, that CFW was informed by Carl Mullis that it was under no obligation to cooperate pursuant to the Tennessee plea agreements. Although CFW contended all along that it was under such a duty, Mr. Mullis informed the defendant that it was not immune from prosecution in South Carolina. In a letter to Mr. Mullis dated March 15, 1982, Mr. Blank wrote:

> I believe you can readily see the dilemma that my clients are faced with if they proceed to provide you with the information requested in the subpoena, or refuse to do same. My position is that without some understanding before hand, I will have to object to the subpoena for if my clients don't co-operate they are in violation of their plea agreement, and if they do co-operate, under your interpretation they can be prosecuted further.

Letter from Edward Blank to Carl Mullis (March 15, 1982). Indeed, CFW refused to comply with the Government subpoena until Mr. Mullis threatened CFW that the Government was going to seek a contempt order. It was only then that CFW turned over the subpoenaed documents. It is clear, therefore, that CFW "cooperated" with the Government because of the outstanding subpoenas, *not* because of the Tennessee plea agreements.

Finally, the defendant argues that both Edward Blank and Richard Braun believed that CFW was protected from further prosecution for antitrust violations. Mr. Braun knew this was Mr. Blank's objective in negotiating the plea agreements, and Mr. Braun thought it had been accomplished. Mr. Blank testified, however, that he was negotiating with regard to liability for violations in the paving industry in Tennessee, and he never considered that there were possible antitrust problems in other construction fields outside of Tennessee. Mr. Braun testified that he was unaware that CFW engaged in the utility construction business and had no knowledge of operations in South Carolina. It is clear, therefore, that the reason both thought CFW's liability was terminated was that neither contemplated any liability for utility construction projects outside of Tennessee.

Once again, an analogy can be made to the law of contracts of release. "When an instrument is so general in its terms as to release rights of a party of which he is ignorant, and which were not in contemplation of the bargain at the time it was made, the instrument will be restrained to the purposes of the bargain, and the release confined to the right intended to be released." 66 Am.Jur.2d *Release* § 32 (1973). *See also,* 76 C.J.S. *Release* § 52 (1952). Since neither Edward Blank nor Richard Braun contemplated CFW's exposure to antitrust liability for utility construction projects outside the State of Tennessee, no grant of immunity can be construed to cover the present indictment.

The conclusion of this court is further buttressed by the testimony and affidavit of Richard Braun. Mr. Braun, by his testimony and affidavit, confirms that the grant of immunity for CFW was limited to the State of Tennessee, and that any broadening of the plea agreement would have to have been approved by his superiors. Edward Blank was informed of the necessity for this procedure, yet no such approval was forthcoming from the Department of Justice. (Government's Exhibit No. 1).

The court must therefore conclude that there was no agreement not to prosecute CFW for bid-rigging in the South Carolina utility construction industry. To accept the

defendant's contentions would require the court to contradict the express written terms of the plea agreements, while the Government's contentions are wholly consistent with the documents and testimony presented to the court at the evidentiary hearing. Accordingly, the court concludes the Government has not breached any non-prosecution agreement and the present charges are not precluded.

## (B) PROSECUTORIAL VINDICTIVENESS [2]

As an alternate ground for dismissal, the defendant argues that the indictment is the result of prosecutorial vindictiveness and is thus violative of its due process rights. In so arguing, the defendant asserts that the acts of the Government indicate that it has violated concepts of justice, fair play and decency.

First, the defendant asserts that, during plea negotiations, the Government attorneys promised a one count indictment on the South Carolina charges in return for CFW's plea of guilty. When CFW refused to plead guilty to any charge, the Government brought a two count indictment against it. CFW contends that the two count indictment is punishment for its exercise of its constitutional right to a jury trial. In support of its contention, the defendant cites *Blackledge v. Perry*, 417 U.S. 21, 94 S.Ct. 2098, 40 L.Ed.2d 628 (1974) and *United States v. Johnson*, 537 F.2d 1170 (4th Cir.1976).

 The court finds these cases to be clearly distinguishable. In *Blackledge* and *Johnson*, the state had made a unilateral decision to bring more serious charges when the defendant's case was overturned on appeal. By contrast, the defendant in this case has never been tried on these antitrust charges. While *Blackledge* and *Johnson* involve post-trial appeals, this case involves *pre-indictment* negotiations. The defendant was in an equal bargaining position with the Government, and was free

to accept or reject the proposed plea agreement. As stated by the court in *Frank v. Blackburn*, 646 F.2d 873 (5th Cir.1980), *cert. denied*, 454 U.S. 840, 102 S.Ct. 148, 70 L.Ed.2d 123 (1981):

> Once the bargain—whether it be reduced charges, a recommended sentence, or some other concession—is rejected, however, the defendant cannot complain that the denial of the rejected offer constitutes a punishment or is evidence of judicial vindictiveness. To accept such an argument is to ignore completely the underlying philosophy and purposes of the plea bargaining system. If a defendant can successfully demand the same leniency after standing trial that was offered to him prior to trial in exchange for a guilty plea, all the incentives to plea bargain disappear; the defendant has nothing to lose by going to trial.

*Id.* at 883.

The United States Supreme Court has recently given approval to the give and take negotiation process in pretrial plea bargaining. In *United States v. Goodwin*, 457 U.S. 368, 102 S.Ct. 2485, 73 L.Ed.2d 74 (1982), the Court held:

> In *Bordenkircher v. Hayes*, 434 U.S. 357 [98 S.Ct. 663, 54 L.Ed.2d 604], the Court for the first time considered an allegation of vindictiveness that arose in a pretrial setting. In that case the Court held that the Due Process Clause of the Fourteenth Amendment did not prohibit a prosecutor from carrying out a threat, made during plea negotiations, to bring additional charges against an accused who refused to plead guilty to the offense with which he was originally charged. The prosecutor in that case had explicitly told the defendant that if he did not plead guilty and "save the court the inconvenience and necessity of a trial" he would return to the grand jury to obtain an additional charge that would significantly increase the defendant's potential punishment. The defend-

**2.** Evidence of the alleged prosecutorial vindictiveness and due process violation was not received at the evidentiary hearing on February 17, 1984, but was submitted to the court on briefs.

ant refused to plead guilty and the prosecutor obtained the indictment. It was not disputed that the additional charge was justified by the evidence, that the prosecutor was in possession of this evidence at the time the original indictment was obtained, and that the prosecutor sought the additional charge because of the accused's refusal to plead guilty to the original charge.

In finding no due process violation, the Court in *Bordenkircher* considered the decisions in *Pearce* and *Blackledge*, and stated:

"In those cases the Court was dealing with the State's unilateral imposition of a penalty upon a defendant who had chosen to exercise a legal right to attack his original conviction—a situation 'very different from the give-and-take negotiation common in plea bargaining between the prosecution and defense, which arguably possess relatively equal bargaining power.' *Parker v. North Carolina*, 397 U.S. 790, 809 [90 S.Ct. 1458, 1749, 25 L.Ed.2d 785] (opinion of BRENNAN, J.)." 434 U.S., at 362 [98 S.Ct., at 667].

The Court stated that the due process violation in *Pearce* and *Blackledge* "lay not in the possibility that a defendant might be deterred from the exercise of a legal right ... but rather in the danger that the State might be retaliating against the accused for lawfully attacking his conviction." 434 U.S., at 363 [98 S.Ct., at 667].

The Court held, however, that there was no such element of punishment in the "give-and-take" of plea negotiation, so long as the accused "is free to accept or reject the prosecution's offer." *Ibid.* The Court noted that, by tolerating and encouraging the negotiation of pleas, this Court had accepted as constitutionally legitimate the simple reality that the prosecutor's interest at the bargaining table is to persuade the defendant to forgo his constitutional right to stand trial. The Court concluded:

"We hold only that the course of conduct engaged in by the prosecutor

in this case, which no more than openly presented the defendant with the unpleasant alternatives of forgoing trial or facing charges on which he was plainly subject to prosecution, did not violate the Due Process Clause of the Fourteenth Amendment." *Id.*, at 365 [98 S.Ct., at 669].

The outcome in *Bordenkircher* was mandated by this Court's acceptance of plea negotiation as a legitimate process. In declining to apply a presumption of vindictiveness, the Court recognized that "additional" charges obtained by a prosecutor could not necessarily be characterized as an impermissible "penalty." Since charges brought in an original indictment may be abandoned by the prosecutor in the course of plea negotiation-in often what is clearly a "benefit" to the defendant-changes in the charging decision that occur in the context of plea negotiation are an inaccurate measure of improper prosecutorial "vindictiveness." An initial indictment-from which the prosecutor embarks on a course of plea negotiation-does not necessarily define the extent of the legitimate interest in prosecution. *For just as a prosecutor may forgo legitimate charges already brought in an effort to save the time and expense of trial, a prosecutor may file additional charges if an initial expectation that a defendant would plead guilty to lesser charges proves unfounded.*

*Id.* at 377–80, 102 S.Ct. at 2491–2492 (emphasis added) (footnotes omitted).

■ The defendant next asserts that the Government attorney indicated to it that, if CFW didn't enter a guilty plea, the attorney would not write a "letter of cooperation" to contracting authorities. Mr. Mullis' recollection, however, differs from that of the defendant. In the Government's brief, Mr. Mullis contends that he advised the defendant that he could not *truthfully* write a letter indicating that CFW had been cooperative if it went to trial. The evidence shows that CFW did not comply with a Government subpoena

until the Government threatened contempt proceedings. The defendant has made several involved motions in this case and is requiring valuable Government time to try this matter. Although the defendant has a right to these constitutional protections, it does not indicate that CFW has "cooperated" with the Government. Mr. Mullis' statement was merely his assessment of his ability to give a truthful statement that CFW has cooperated with the Government. Even if Mr. Mullis' statement could possibly be regarded as an inducement to plea, it is at most a part of the acceptable give and take of the plea bargaining process.

■ The defendant argues that the threats by the Government to have the defendant's attorney disqualified indicate prosecutorial vindictiveness. To the contrary, the court finds that the Government was expressing a legitimate concern over the inherent conflict of interest that could arise by one attorney representing both CFW and its employees. In so doing, the Government was attempting to assure that the defendant received unbiased, conflict-free counsel guaranteed by the Sixth Amendment. Failure of the court to consider this issue would be grounds for reversal. *United States v. Garcia,* 517 F.2d 272 (5th Cir.1975); *U.S. v. Duklewski,* 567 F.2d 255 (4th Cir.1977). The Government's concern over possible conflicts of interest of the defendant's counsel is not probative of any prosecutorial vindictiveness.

■ Finally, the defendant argues that the Government prosecutor has the "overt desire ... to see [CFW] put out of business because it refuses to enter a guilty plea." (Defendant's Memorandum, at 21). There is no evidence to support this contention. The Antitrust Division of the United States Department of Justice has no control whatsoever over the actions of the licensing authorities in the states within which CFW operates. Mr. Mullis could not force the state or federal licensing authorities to debar CFW, nor could he prevent them from doing so. There is no indication that Mr. Mullis is conducting a personal vendetta against CFW. In summary, the defendant

has produced no evidence of prosecutorial vindictiveness to justify a dismissal of the present antitrust charges.

## (C) DUE PROCESS

As a final ground for seeking dismissal, the defendant asserts that the Government has arbitrarily decided to prosecute CFW in violation of its own regulations. The defendant argues that this is selective prosecution in that the Government is discriminating against similarly situated individuals and is thus violating the Fifth Amendment to the United States Constitution.

■ Initially, the defendant asserts that "The United States Department of Justice, Principles of Federal Prosecution" (1980) (hereinafter "Federal Principles") provides that federal prosecution should be declined if a person or corporation has been subjected to effective prosecution in another jurisdiction. The defendant's argument must fail, however. It is clear that the cited provision (Federal Principles, Part B, No. 4) deals with multiple prosecutions for one criminal act or conspiracy. In addition, this provision addresses the discretion a federal prosecutor should exercise in deferring to state prosecution. The cited provision is thus clearly inapplicable to the present set of facts. In the present situation, the defendant is not being prosecuted twice for the same criminal act, but is being charged for the first time with antitrust violations, which are wholly separate from those brought against the affiliated parties in Tennessee. The cited provision, therefore, does not preclude the present charges.

■ The defendant next asserts that the Government has a policy of not prosecuting companies which have cooperated with it and that there is a policy of immunity for information given early in an investigation. It is clear, however, that no such policy exists within the Justice Department. "A person's willingness to cooperate in the investigation or prosecution of others is another appropriate consideration in the determination whether a federal

prosecution should be undertaken. Generally speaking, *a willingness to cooperate should not, by itself, relieve a person of criminal liability.*" Federal Principles, at Part B, No. 3(f). (emphasis added).

 Finally, the defendant argues that there is a Governmental policy of not forcing corporations out of business. No such policy has been cited or proved to the court. Additionally, as noted earlier, the Justice Department has no control over state licensing boards and other awarding authorities. Whether this prosecution will or will not force the defendant out of business is a matter of pure speculation. Therefore, the claimed violation of the defendant's Fifth Amendment rights is without merit.

## CONCLUSION

"Fair administration of the criminal process and the interests of justice do not permit the prosecution to violate, whether intentionally or unintentionally, promises made in the negotiation of guilty pleas." *United States v. Barrett,* 390 F.Supp. 1022, 1024 (D.S.C.1975) (quoting *United States v. Ewing,* 480 F.2d 1141 (5th Cir. 1973)). "When the United States Government gives its word to or makes an agreement with one of its citizens, the Government must be held to that agreement and keep its promises .... The most meticulous standards of both promise and performance must be met by prosecutors engaged in negotiating such agreements."

*United States v. Phillips Petroleum Company,* 435 F.Supp. 622, 640 (N.D.Okl.1977).

If it could be demonstrated to this court that there was actually a prosecutorial promise not to charge CFW for antitrust violations in any jurisdiction, this court would not hesitate to dismiss the present indictment. Based upon the evidence presented, however, the court must conclude that no such promise was ever given. If such a promise did exist, both William Carter and his counsel, Edward Blank, had ample opportunity to reduce this agreement to writing or inform the District Court[3] of such an agreement in entering the Tennessee guilty pleas. At best, CFW's position could be thus stated: Neither Mr. Blank nor Mr. Braun were aware of any exposure by CFW to antitrust violations outside the State of Tennessee, and based on this [now erroneous] assumption, neither saw any need to grant CFW any such immunity [in the plea negotiations] extending beyond the geographical boundaries of the State of Tennessee. The present charges, therefore, are not barred by the Tennessee plea agreements.

Furthermore, this court can find no evidence of prosecutorial vindictiveness or impermissible selective prosecution.

The Court in *Bordenkircher* stated that the validity of a pretrial charging decision must be measured against the broad discretion held by the prosecutors to select the charges against an accused. "Within the limits set by the legislature's

---

**3.** Edward Blank was present in the District Court during the court's consideration of each plea bargain. During questioning of the defendants, Mr. Blank never indicated to the District Court that there was a collateral agreement or understanding that CFW would not be subject to prosecution in other jurisdictions. In reviewing the scope of the Tennessee Paving plea bargain, the District Court engaged in the following exchange with Mr. Blank and Mr. Carter:

THE COURT: In addition, the Government agrees it will not further prosecute the Defendant's subsidiary, Hot-Mix, Inc., or the parent company, C.F.W. Construction Company for or on account of any collusion between the companies or any other contractors with regard to any other construction projects let by awarding authorities in the State of Tennessee prior to the date of this agreement.

MR. CARTER: Yes, Your Honor.
THE COURT: Is that the total deal? That deal means, as I understand it now, you have got a non-operating company here that's going to pay a fine, going to be blacklisted, and you've got three operating companies who are not going to be blacklisted.
MR. BLANK: If Your Honor please, another company non-operating, Hot-Mix.
THE COURT: You didn't think I'd understand that, did you, Mr. Blank?
MR. BLANK: Yes, sir, I've known Your Honor for sometime, and I know you understand everything that's involved.
....
THE COURT: Is this the whole deal, Mr. Carter?
MR. CARTER: Yes, Your Honor.
(Government's Exhibit No. 2, at 6–7).

**212**

constitutionally valid definition of chargeable offenses, 'the conscious exercise of some selectivity in enforcement is not itself a federal constitutional violation' so long as 'the selection was [not] deliberately based upon an unjustifiable standard such as race, religion, or other arbitrary classification.' " *Id.*, [434 U.S.] at 364 [98 S.Ct. at 668] (quoting *Oyler v. Boles*, 368 U.S. 448, 456 [82 S.Ct. 501, 505, 7 L.Ed.2d 446]). A charging decision does not levy an improper "penalty" unless it results solely from the defendant's exercise of a protected legal right, rather than the prosecutor's normal assessment of the societal interest in prosecution. *United States v. Goodwin*, 457 U.S. 368, 380 n. 11, 102 S.Ct. 2485, 2492 n. 11, 73 L.Ed.2d 74 (1982).

For the foregoing reasons and based upon the cited authorities,

IT IS ORDERED that the defendant's motion to dismiss the indictment is denied.